UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 19-10138-CIV-MORENO**

LEEANNE YULE,

     Plaintiff,

vs.

OCEAN REEF COMMUNITY ASSOCIATION,
ORCAT, INC., and DAVID RITZ,

     Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS AND
ORDER DENYING MOTION TO DENY OR STRIKE JURY DEMAND**

In this work place sexual harassment and constructive termination case, Plaintiff LeeAnne Yule asserts nine claims against Defendants Ocean Reef Community Association, ORCAT, Inc., and David Ritz.  Against Ocean Reef Community Association and ORCAT, Inc., Yule brings six claims under Title VII, the Florida Civil Rights Act, and Florida common law for sexual-harassment hostile work environment, constructive discharge, retaliation, vicarious liability/*respondeat superior*, negligent retention, and negligent supervision.  Against Ritz, Yule advances three claims under Florida common law for battery, sexual assault, and intentional infliction of emotional distress.

Defendants moved separately to dismiss the Amended Complaint, and Ocean Reef Community Association moved to strike Yule's jury demand.  Yule opposes each motion.

For the reasons that follow, the Motions to Dismiss **(D.E. 48, 50, 51)** are **GRANTED IN PART AND DENIED IN PART**, and the Motion to Deny and/or Strike Plaintiff's Demand for Jury Trial **(D.E. 49)** is **DENIED**.

## I.       **BACKGROUND**

In this case, Plaintiff LeeAnne Yule alleges that she was constructively terminated from her employment with Defendants Ocean Reef Community Association and ORCAT, Inc. (the "ORCA Entities") because the ORCA Entities long sponsored, promoted, or permitted a hostile work environment.  (*See* D.E. 47 at ¶¶ 1, 6, 17, 35–36.)

Yule alleges that the hostile work environment stems from the conduct of another Defendant, David Ritz, who was the President of the ORCA Entities during Yule's employment.  *Id.* at ¶¶ 8, 21–22, 24–26.[1]  Yule alleges that during working hours at the work place, Ritz made a series of unwelcome sexual advances on her, including hugging her, pressing his body against her while grabbing her buttocks, forcible kissing her, shoving his tongue into her mouth, and pushing his erect penis against her body.  *Id.* at ¶ 24.  She further alleges that, also during work hours at the work place, Ritz publicly directed a series of unwelcome lewd comments toward Yule, such as referring to her loudly as "Baby" and remarking that she "had a nice ass."  *Id.*  This conduct continued "unabated and at least monthly through November of 2017."  *Id.*[2]

Yule also alleges that Ritz made various comments of a threatening nature to her that were intended to control and manipulate her, and allow Ritz to continue his exploitation and abuse of her.  *Id.* at ¶ 21.  For instance, Yule alleges that Ritz told her that he kept digital copies of photos and videos taken of her performing certain sexual acts, despite Yule's demand that Ritz destroy the pictures and videos at the end of their romantic relationship.  *Id.* at ¶¶ 18–20.  Yule also alleges that Ritz would hand deliver her paycheck to her and repeatedly tell her to: "[r]emember, I am

---

[1] Before Yule's employment with the ORCA Entities, she and Ritz were involved in a romantic relationship.  (D.E. 47 at ¶ 18.)

[2] Yule also alleges that Ritz demanded that she engage in oral, vaginal, and anal sex with him, but these demands were all made in either Yule's or Ritz's residence.  *Id.* at ¶ 23.

ORCA." *Id.* at 22.

Yule alleges that she reasonably believed that disclosing Ritz's conduct would result in the loss of her employment and disclosure of the sexually explicit photos and videos of her that Ritz kept. *Id.* at ¶ 25. Yule further alleges that she reasonably believed that internal reporting of Ritz's conduct would be futile because the ORCA Entities, which were controlled by Ritz, long ratified a hostile work environment. *Id.* at ¶ 26.

In January 2018, the ORCA Entities started an investigation after another employee made allegations of gender bias and harassment. *Id.* at ¶ 27. As part of the investigation, Yule was questioned by counsel for the ORCA Entities in late spring or early summer of 2018. *Id.* at ¶ 28.[3] During the questioning, Yule reported sexual abuse, sexual misconduct, and harassment, which she believes is consistent with her allegations here. *Id.* at ¶ 31. Yule asserts that the investigation was a "pretext to intimidate and silence" her and other victims of Ritz's conduct. *Id.* at ¶ 32.

In June 2018, following the questioning, Yule alleges that her parents received a threatening phone call from a man who identified himself as an Ocean Reef Community Association employee. *Id.* at ¶ 33. Yule alleges that the unidentified man suggested that she would face consequences for disclosing information about Ritz's conduct. *Id.*

In August 2018, the ORCA Entities started mandatory training for its employees for identifying, preventing, and reporting sexual misconduct and harassment in the work place. *Id.* at ¶ 34. The training was conducted under the supervision and control of Ritz. *Id.* In September 2018, Yule resigned from her employment. *Id.* at ¶ 35. Yule insists that her resignation was, as a matter of law, a constructive discharge because her resignation was the direct and proximate result

---

[3] Yule alleges that she asked for permission to retain her own attorney due to concerns that her employment would be jeopardized or that Ritz would retaliate. *Id.* at ¶ 29. According to Yule, her request was "ignored or denied." *Id.* at ¶ 30.

of the continued, unabated hostile work environment perpetrated by Ritz and the ORCA Entities.

In November 2018, Yule filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Rights. *Id.* at ¶ 13. In May 2019, Yule requested a Notice of Right to Sue. *Id.* at ¶ 14. Before filing this lawsuit, Yule notified the EEOC that she was going to file her lawsuit because 180 days expired since the Charge of Discrimination was filed and all conditions precedent to filing the lawsuit were fulfilled. *Id.* at ¶ 16. On June 3, 2019, the EEOC issued a Notice of Right to Sue. *Id.*

## II.   LEGAL STANDARD

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. *Id.* at 679. Detailed factual allegations are not required, but the complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly*, 550 U.S. at 555 (citation omitted). The factual allegations must be enough to "raise a right to relief above the speculative level." *Id.* (citations omitted). Finally, at the motion to dismiss stage, the Court must view the allegations in the complaint in the light most favorable to the plaintiffs and accept well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986).

### III.   DISCUSSION

Yule asserts six claims against the ORCA Entities under Title VII, the Florida Civil Rights Act, and Florida common law for sexual-harassment hostile work environment (Count 1), constructive discharge (Count 2), retaliation (Count 3), vicarious liability/*respondeat superior* (Count 7), negligent retention (Count 8), and negligent supervision (Count 9).  As to Ritz, Yule asserts three claims under Florida common law for battery (Count 4), sexual assault (Count 5), and intentional infliction of emotional distress (Count 6).

ORCAT, Inc. moves to dismiss Counts 1–3 and 7–9, Ocean Reef Community Association moves to dismiss only Counts 7–9, and Ritz moves to dismiss Counts 4–6.  Yule opposes the motions and insists that her Amended Complaint adequately pleads all claims.  The Court addresses each claim in turn.

### A.   TITLE VII AND FLORIDA CIVIL RIGHTS ACT CLAIMS (COUNTS 1–3)

To start, ORCAT, Inc. argues that the claims under Title VII and the Florida Civil Rights Act (Counts 1–3) must be dismissed *with* prejudice for failure to exhaust administrative remedies because Yule's Charge of Discrimination with the EEOC does not specifically name ORCAT, Inc. Yule counters that she satisfied the EEOC's filing requirements because the purpose of the naming requirement—putting ORCAT, Inc. on notice—was substantially met because ORCAT, Inc. is closely related to Ocean Reef Community Association.

Generally, only a party named in an EEOC charge can later be charged in a lawsuit filed in court under Title VII.  *Peppers v. Cobb County, Ga.*, 835 F.3d 1289, 1296 (11th Cir. 2016) (citing *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1358–59 (11th Cir. 1994)).  This naming requirement "serves to notify the charged party of the allegations and allows the party an opportunity to participate in conciliation and voluntarily comply with the requirements of

Title VII." *Id.* (quoting *Virgo*, 30 F.3d at 1358–59).

Here, Yule alleges in her Charge of Discrimination that she was "a former employee of Ocean Reef Cat Rescue, an affiliated entity of Ocean Reef Community Association (ORCA), [who] suffered constructive termination of her employment . . . as a result of pervasive discrimination, sexual harassment, and retaliation . . . by ORCA and its President, David Ritz." (D.E. 47-1 at 2.)  Beyond a single, passing reference to "Ocean Reef Cat Rescue" at the start, the Charge of Discrimination's allegations of harassment exclusively reference the abbreviation "ORCA"—which the Charge specifically uses to refer to Ocean Reef Community Association. *See id.* at 2 ("*ORCA has* long tolerated, acquiesced or promoted a working environment manifestly hostile and damaging to its female work force under the leadership of Mr. Ritz."); *id.* ("From the time Ms. Yule began working *at ORCA* . . . ."); *id.* at 3 ("*ORCA's insensitivity and indifference* to Ms. Yule and other victims of Mr. Ritz's sexual harassment . . . ."); *id.* ("Through its counsel, *ORCA summoned and questioned* Ms. Yule . . . .") (emphases added).  Indeed, there is no allegation in the Charge that ORCAT, Inc. engaged in any harassing conduct.  *See id.*  In short, then, the Court finds that the single (and somewhat inaccurate) passing reference to "Ocean Reef Cat Rescue" is not enough to put ORCAT, Inc. on notice of any harassing conduct such that it could meaningfully participate in a conciliation process and voluntarily comply with Title VII.

Even though ORCAT, Inc. is not specifically named in the Charge of Discrimination, courts in the Eleventh Circuit liberally construe the naming requirement and, "where the Act's purposes are fulfilled, a party not named in an EEOC charge may be subject to federal court

jurisdiction." *Peppers*, 835 F.3d at 1296–97 (citing *Virgo*, 30 F.3d at 1358–59).[4]  For instance, "[w]here two or more defendants are *closely related entities*, an administrative charge and right to sue notice against one defendant may be sufficient to provide notice to the other defendants and thus satisfy the administrative filing requirement."  *Virgo v. Riviera Beach Assocs., Ltd.*, No. 908142CIVMORENO, 1992 WL 1476964, at *4 (S.D. Fla. Nov. 19, 1992) (emphasis added and citations omitted), *aff'd*, 30 F.3d 1350; *see also Gordon v. MCG Health, Inc.*, 301 F. Supp. 2d 1333, 1339 (S.D. Ga. 2003) ("Where an unnamed defendant is a closely related entity to the named party, it should be held to have received notice.") (citing *Virgo*, 30 F.3d at 1358–59).

Turning to the Amended Complaint, although the allegations suggest that ORCAT, Inc. and Ocean Reef Community Association are "closely related," the Court finds that the allegations, even when taken as true, fall short of making this showing.  Yule must put forward factual allegations showing the nature of the relationship between the ORCA Entities.  But the only factual allegations relevant to this relationship are that Ocean Reef Community Association "is the registered agent of ORCAT," "manage[s] and/or oversees the work of ORCAT," and that Ritz "managed and/or supervised the ORCA Entities."  (D.E. 47 at ¶¶ 3–4, 8.)  Being a registered agent is not enough to say that two entities are "closely related" such that notice of discriminatory conduct should be imputed to an entity that was not specifically named in a charge of discrimination; and the last two allegations, although fact-based, are left without elaboration.

---

[4] ORCAT, Inc. argues that a Charge of Discrimination is given a liberal construction only where a plaintiff is not represented by counsel at the time the Charge is filed.  Although retained counsel should be able to satisfy the naming requirement with relative ease, thereby avoiding any issues, ORCAT, Inc.'s argument has no binding legal basis.  For starters, ORCAT, Inc.'s argument relies exclusively on non-binding out-of-circuit authority.  Furthermore, although the plaintiff in *Virgo* filed her Charge of Discrimination without legal representation, this played no role in this Court's ruling in *Virgo*.  *See Virgo*, 1992 WL 1476964, at *4–6.  Nor did it factor into the Eleventh Circuit's affirmance.  *See Virgo*, 30 F.3d at 1358–59.

Furthermore, the conclusory allegations that ORCAT, Inc. is "an affiliated entity" and "a related entity" of Ocean Reef Community Association are also not sufficient to impute notice of discriminatory conduct.  Finally, Yule does not even allege that ORCAT, Inc. is a "closely" related entity of Ocean Reef Community Association.

For these reasons, the Court finds that the Amended Complaint fails to allege facts giving rise to the reasonable inference that ORCAT, Inc. is a "closely related" entity of Ocean Reef Community Association.  Consequently, ORCAT, Inc.'s Motion to Dismiss is **GRANTED** as to Counts 1–3, which are accordingly **DISMISSED**.

**B.**     **COMMON LAW CLAIMS AGAINST RITZ (COUNTS 4–6)**

Yule advances Florida common law claims against Ritz for battery (Count 4), sexual assault (Count 5), and intentional infliction of emotional distress (Count 6).  Ritz argues that all three claims should be dismissed.  Yule urges otherwise.

**1.**     **Battery (Count 4) and Sexual Assault (Count 5)**

Under Florida law, battery is "the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent."  *Pena v. Marcus*, 715 F. App'x 981, 988 (11th Cir. 2017) (quoting *Quilling v. Price*, 894 So. 2d 1061, 1063 (Fla. 5th DCA 2005)).  And an assault is "an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril."  *Id.* (quoting *Sullivan v. Atl. Fed. Sav. & Loan Ass'n*, 454 So. 2d 52, 54 (Fla. 4th DCA 1984)).  Whether a defendant's actions constitute battery or assault is determined under a reasonableness standard.  *Id.* (citations omitted).

Ritz argues that Counts 4 and 5 should be dismissed because the Amended Complaint asserts nothing more than a threadbare, formulaic recitation of the elements of these causes of

action, and because Yule does not specifically identify any alleged sexual-based conduct. Yule responds that Ritz tries to hold her to a heightened pleading standard, and she maintains that her factual allegations satisfy Rule 8.

Yule is not required to set forth more specific facts to satisfy Rule 8. *See Doe v. Epstein*, 611 F. Supp. 2d 1339, 1344 (S.D. Fla. 2009). All that Rule 8 requires is that the Amended Complaint "set forth a short and plain statement of the facts upon which the claim is based that is sufficient to give the defendant fair notice of what the plaintiff's claims are and the grounds upon which they rest." *Id.* (denying motion to dismiss battery and sexual assault claims and rejecting defendant's argument that plaintiff failed to allege "the specific facts" as to what was done to the plaintiff, and what defendant said and did to create fear and apprehension to the plaintiff).

After reviewing the factual allegations in the Amended Complaint, the Court finds that Yule sufficiently alleges battery and sexual assault. As to battery, Yule alleges that Ritz "intentionally made uninvited, unauthorized, offensive physical contact" with her. (D.E. 47 at ¶ 54.) In support of this legal assertion, Yule alleges that during work hours at the work place, Ritz publicly made "unwelcome" sexual contact by "hugging [her]," "pressing his body against hers while grabbing her buttocks," "forcibly kissing [her]," "shoving his tongue into her mouth," and "pushing his erect penis against [her] body." *Id.* at ¶ 24. According to Yule, this conduct "occurred unabated and at least monthly though November of 2017." *Id.* The Court finds that these factual allegations sufficiently plead offensive contact with intent to cause such contact.

Turning to sexual assault, Yule alleges that Ritz made "intentional, unlawful threats of harmful and offensive sexual contact" upon her, and that Ritz's conduct placed Yule "in imminent fear of being subjected to [Ritz's] sexual battery." *Id.* at ¶¶ 58–59. Yule supports this legal assertion with, in addition to the allegations of offensive sexual contact, factual allegations that at

work during work hours Ritz publicly directed "unwelcome" lewd remarks toward her, such as by "referring loudly to [her] as 'Baby' and remarking that she 'had a nice ass.'" *Id.* at ¶ 24. According to Yule, this conduct "occurred unabated and at least monthly though November of 2017." *Id.*[5] Yule also alleges that, outside of the work place, Ritz "demanded that [she] engage in oral, vaginal, and anal sex with him." *Id.* at ¶ 23.

Beyond offensive sexual contact, lewd remarks, and sexual demands, Yule also alleges that Ritz made various comments of a threatening nature to her that were "intended to control and manipulate" her, and allow Ritz "to continue his exploitation and abuse" of her. *Id.* at ¶ 21. For instance, Yule alleges that Ritz told her that he kept digital copies of photos and videos taken of Yule performing certain sexual acts, despite Yule's demand that Ritz destroy the pictures and videos at the end of their romantic relationship. *Id.* at ¶¶ 18–20. According to Yule, Ritz displayed nude photos of her on a website that he maintained. *Id.* at ¶ 20. Yule also alleges that Ritz, the President of the ORCA Entities during Yule's employment, would hand deliver Yule's paycheck to her and repeatedly tell her: "[r]emember, I am ORCA." *Id.* at ¶¶ 1, 8, 22. Based on these allegations, Yule alleges that she reasonably believed that disclosing Ritz's conduct would result in her losing her employment and Ritz disclosing the photos and videos. *Id.* at ¶ 25.

Taken together, the allegations of repeated offensive sexual contact, sexual demands, lewd remarks, and threatening comments, gives rise to the reasonable inference that Yule reasonable feared sexual contact. And Ritz does not cite any case that dismissed battery or sexual assault claims based on allegations like those asserted by Yule here. Although at this stage it is Yule's

---

[5] Although Ritz takes issue with the lack of dates on which the alleged sexual-based conduct occurred, he makes clear in his Reply that he is not advancing a statute of limitations defense at this time. In any event, because Yule alleges that Ritz's most recent sexual conduct occurred in November 2017, it appears that the claims filed against Ritz on May 31, 2019 are within the statute of limitations.

allegations that are given weight, Ritz will surely have the opportunity to disprove these allegations at summary judgment or trial.  For now, taking the allegations as true, as the Court must, the Court finds that Yule plausibly alleges claims for battery and sexual assault.  Ritz's Motion to Dismiss is thus **DENIED** as to Counts 4 and 5.

### 2.     Intentional Infliction of Emotional Distress (Count 6)

Finally, Yule alleges that Ritz intentionally inflicted emotional distress upon her.  Ritz argues that this claim should be dismissed because Yule's factual allegations fail to satisfy the burdensome threshold imposed under Florida law.  Yule insists that Ritz's argument misses the mark, and that the sum of her allegations show that Ritz's alleged conduct was outrageous.

To state a claim for intentional infliction of emotion distress under Florida law, Yule must allege that: (1) Ritz engaged in intentional or reckless conduct; (2) the conduct was "outrageous"; (3) the conduct caused emotional distress; and (4) the emotional distress was severe.  *See Hart v. United States*, 894 F.2d 1539, 1548 (11th Cir. 1990) (citing *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278 (Fla. 1985)).  What constitutes "outrageous" conduct is a question of law.  *Noah v. Assor*, 379 F. Supp. 3d 1284, 1299 (S.D. Fla. 2019).  In *Metro. Life Ins. Co.,* the Florida Supreme Court adopted this explanation of outrageous conduct:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim, "Outrageous!"

467 So. 2d at 278–79 (quoting Restatement (Second) of Torts, § 46 cmt. d (1965)).  Although there is no exhaustive or concrete list of what constitutes "outrageous conduct," Florida common law has "evolved an extremely high standard."  *Noah*, 379 F. Supp. 3d at 1299 (quoting *Casado v. Miami-Dade Cty.*, 340 F. Supp. 3d 1320, 1332 (S.D. Fla. 2018)).

Ultimately, though, the "touchstone" of these cases is "the presence of relentless physical, as well as verbal, harassment." *Vernon v. Med. Mgmt. Assocs. of Margate, Inc.*, 912 F. Supp. 1549, 1559 (S.D. Fla. 1996). So although these claims are upheld "only in 'extremely rare circumstances,'" *Noah*, 379 F. Supp. 3d at 1299 (quoting *Casado*, 340 F. Supp. 3d at 1332), courts have found that the "outrageousness" element is met in cases involving work place harassment where there are allegations of "repeated verbal abuse coupled with repeated offensive physical contact," *Johnson v. Thigpen*, 788 So. 2d 410, 412–14 (Fla. 1st DCA 2001) (affirming finding of "outrageousness" where the defendant, an attorney, repeatedly engaged in "offensive, unwelcomed physical contact" of his employee (the plaintiff) at the work place by touching her breasts, running a pencil up her thigh, and forcibly placing her hand on the crotch of the defendant's pants); *see also Vernon*, 912 F. Supp. at 1557–60 (denying motion to dismiss and finding "outrageousness" where, at work, the supervisor-defendant repeatedly touched the employee-plaintiff's buttocks, breasts, and belly button, squeezed her nipples, hugged and tickled her, and repeatedly made lewd and vulgar sexual remarks); *Stockett v. Tolin*, 791 F. Supp. 1536, 1540, 1555–56 (S.D. Fla. 1992) (finding "outrageousness" where defendant, the majority stockholder of the plaintiff's employer, sexually harassed the plaintiff by "groping and kissing" her, "repeated[ly] and offensive[ly] touching . . . the most private parts of Plaintiff's body," "pinning Plaintiff against the wall and refusing to allow her to escape," and other "repeated verbal licentiousness"); *Urquiola v. Linen Supermarket, Inc.*, No. 94-14-CIV-ORL-19, 1995 WL 266582, at *4 (M.D. Fla. Mar. 23, 1995) (denying motion to dismiss and finding "outrageousness" where defendant, in addition to constantly directing "sexually explicit, demeaning and vulgar language" toward the plaintiff, engaged in "repeated acts of physical abuse" of the plaintiff at the work place by kissing her, groping her, and attempting to rape her); *Sosa v. Dryclean-USA*, No. 96-3717-Civ, 1997 WL

580600, at *1–2 (S.D. Fla. June 25, 1997) (denying motion to dismiss and finding "outrageousness" where the supervisor-defendant "repeatedly touched [the employee-plaintiff's] body in a sexual manner and attempted to kiss her," "threatened to fire [her] if she refused to engage in sexual intercourse with him," and made other sexually lewd comments about her breasts and having sex with him).

Here, as discussed above, Yule alleges that Ritz made offensive sexual contact with her on a monthly basis through November 2017. (*See* D.E. 47 at ¶ 24 (alleging that Ritz publicly made, unabated, unwelcome, physically sexual advances on Yule during work hours at the work place, by hugging her, pressing his body against hers while grabbing her buttocks, forcibly kissing her, shoving his tongue into her mouth, and pushing his erect penis against her body).) In addition to this repeated offensive sexual contact, Yule also alleges that during work hours Ritz also repeatedly made lewd remarks to Yule. *Id.* (alleging that Ritz "refer[ed] loudly to [her] as 'Baby' and remark[ed] that she 'had a nice ass'"). And outside the workplace, Yule alleges that Ritz made demands for oral, vaginal, and anal sex. *Id.* at ¶ 23.

Here, the allegations of repeated offensive sexual contact, lewd remarks, sexual demands, and threatening comments align more with the cases allowing work place intentional infliction of emotional distress claims to proceed to summary judgment. *See supra*, *Vernon*, 912 F. Supp. at 1557–60; *Sosa*, 1997 WL 580600, at *1–2; *Urquiola*, 1995 WL 266582, at *4. And, notably, Ritz does not cite any case that dismissed an intentional infliction of emotional distress claim under Florida law where the plaintiff alleged, as Yule alleges here, repeated offensive sexual contact coupled with lewd remarks, sexual demands, and threatening comments.

Of course, even though Yule's allegations are the ones given weight at this stage, they have not proven anything; at summary judgment or trial, Yule must still prove the remaining elements

of her intentional infliction of emotional distress claim, and Ritz will be able to present evidence to disprove Yule's allegations.  But for now, the claim survives dismissal.

## C.   COMMON LAW CLAIMS AGAINST THE ORCA ENTITIES (COUNTS 7–9)

The ORCA Entities argue that the common law claims for vicarious liability/*respondeat superior* (Count 7), negligent retention (Count 8), and negligent supervision (Count 9) should be dismissed in full.  Yule maintains that her factual allegations plausibly allege these common law claims.  The Court addresses each claim in turn.

### 1.   Vicarious Liability/*Respondeat Superior* (Count 7)

The ORCA Entities' primary argument for dismissal is that they cannot be held vicariously liable for Ritz's alleged battery, sexual assault, and intentional infliction of emotional distress because the conduct underlying these claims was "outside the scope" of Ritz's employment, and not actuated with any purpose to serve the ORCA Entities.   ORCAT, Inc. separately raises additional arguments for dismissal based on agency principles and the scope of an employer's duty to protect potential plaintiffs away from work premises.

#### a)   Scope of Employment

Under the doctrine of *respondeat superior*, an employer cannot be held liable for the tortious or criminal acts of an employee, unless the acts were committed during the course of the employment and to further a purpose or interest, however excessive or misguided, of the employer. *Iglesia Cristiana La Casa Del Senor, Inc. v. L.M.*, 783 So. 2d 353, 356–57 (Fla. 3d DCA 2001) (citing *Nazareth v. Herndon Ambulance Serv., Inc.*, 467 So. 2d 1076, 1078 (Fla. 5th DCA 1985)). An employee's conduct is within the scope of his or her employment where: (1) the conduct is of the kind he or she was employed to perform; (2) the conduct occurs substantially within the time and space limits authorized or required by the work to be performed; and (3) the conduct is

- 14 -

activated at least in part by a purpose to serve the master.  *Id.* at 357 (citing *Sussman v. Florida E. Coast Props., Inc.*, 557 So. 2d 74, 75–76 (Fla. 3d DCA 1990)).

Generally, battery and sexual assault by employees are held to be outside the scope of an employee's employment, and therefore, insufficient to impose vicarious liability on the employer. *Id.* (quoting *Nazareth*, 467 So. 2d at 1078).  But an exception exists where the tortfeasor is "assisted in accomplishing the tort by virtue of the employer/employee relationship."  *Id.* (quoting *Nazareth*, 467 So. 2d at 1078).  One example is where a subordinate employee alleges that another employee, in a supervisory role or in another position of power, battered or sexually assaulted the subordinate employee during work hours on work premises.  *See, e.g.*, *Blount v. Sterling Healthcare Grp., Inc.*, 934 F. Supp. 1365, 1368, 1372–73 (S.D. Fla. 1996) (allowing *respondeat superior* claim where plaintiff alleged that the employee-defendant, the President of the employer-defendant, "was acting as [the plaintiff's] supervisor during work hours and on work premises, and so in the scope of his employ when the alleged torts were committed").

Here, as explained above, Yule plausibly alleges battery, sexual assault, and intentional infliction of emotion distress against Ritz.  These claims are premised on allegations that, at work during work hours, Ritz repeatedly made unwelcome offensive sexual contact with Yule, made lewd remarks, and made comments of a threatening nature while hand-delivering her pay check. Yule also alleges that Ritz told her that he kept digital copies of photos and videos taken of her performing sexual acts.  Although it is not clear whether these statements were made to Yule at work during work hours, or whether Ritz made them while acting in his capacity as President, Yule alleges that she believed that disclosing Ritz's conduct to the ORCA Entities would result in her termination and in Ritz disclosing the photos and videos.

Taken as true, the Court finds that Yule plausibly alleges that Ritz's tortious conduct,

occurring at work during work hours while acting as President of the ORCA Entities, was committed within the scope of his employment and was activated at least in part by a purpose to serve the ORCA Entities—no matter how excessive or misguided.  *See Blount*, 934 F. Supp. at 1372–73.  Ultimately, whether Ritz's alleged tortious conduct was within the scope of his employment is a "question of fact best decided by a jury."  *Id.* at 1372 (citations omitted).  For now, Yule plausibly alleges that Ritz's conduct occurred within his "scope of employment."

### b)      Remaining Arguments

ORCAT, Inc. asserts three additional arguments for dismissing the *respondeat superior* claim.  First, it argues that the claim should be dismissed because an agency relationship requires that the principal control the agent's actions.  And that here, because Yule alleges that Ritz "controlled" the ORCA Entities, it follows that Ritz cannot also be an agent of the ORCA Entities.

It is "axiomatic" that "a corporation can act only through its agents."  *Stockett*, 791 F. Supp. at 1560.  So when the agent of a corporation who causes harm is also the managing agent or primary owner of the corporation, the corporation can still be held liable for the acts of the managing agent.  *Id.* (citations omitted); *see also Kent Ins. Co. v. Schroeder*, 469 So. 2d 209, 210 (Fla. 5th DCA 1985) (explaining that "by virtue of his position as corporate president of [the company] and the manager of the bar owned by [the company], the acts of [the corporate president] are indistinguishable from the acts of the corporation itself").  Thus, the agency argument fails.

Second, ORCAT, Inc. argues the claim should be dismissed because an employer does not owe a duty to protect plaintiffs when the alleged conduct occurs outside of the employer's premises.  Although some of Yule's allegations involve conduct by Ritz outside of the work place, really, the *respondeat superior* claim derives from and centers on Ritz's alleged tortious conduct that occurred "during work hours at the work place."  (*See* D.E. 47 at ¶ 24.)  To this end, Yule

plausibly alleges *respondeat superior*.  Whether ORCAT, Inc. can ultimately be held liable for Ritz's conduct outside of the work place is a proximate causation issue to be decided at summary judgment or trial.  Accordingly, this argument also fails.

Finally, although ORCAT, Inc. correctly argues that Florida does not recognize a common law cause of action based on the negligent failure to maintain a workplace that is free of sexual harassment, this is not a basis for dismissing the *respondeat superior* claim.  This is because Yule's claim is premised on the well-established common law claims of battery, sexual assault, and intentional infliction of emotional distress.[6]  This argument thus fails as well.

For all these reasons, the Motions to Dismiss are **DENIED** as to Count 7.

## 2.    Negligent Retention (Count 8) and Negligent Supervision (Count 9)

A claim for negligent retention or supervision[7] "requires that an employee's wrongful conduct be committed outside the scope of employment."  *Buckler v. Israel*, 680 F. App'x 831, 834 (11th Cir. 2017) (citing *Mallory v. O'Neil*, 69 So. 2d 313, 315 (Fla. 1954)); *see also Belizaire v. City of Miami*, 944 F. Supp. 2d 1204, 1214 (S.D. Fla. 2013) (noting tort of negligent retention "allows for recovery against an employer for acts of an employee committed outside the scope and course of employment") (quoting *Garcia v. Duffy*, 492 So. 2d 435, 438 (Fla. 2d DCA 1986)).

The ORCA Entities argue that Counts 8 and 9 must be dismissed because Yule does not

---

[6] ORCAT, Inc. makes the same argument in support of dismissing the negligent retention and negligent supervision claims.  But, for the same reasons explained here, this argument fails there as well.  *See Samedi v. Miami-Dade County*, 134 F. Supp. 2d 1320, 1353 n.30 (S.D. Fla. 2001) (noting battery and sexual assault claims serve as underlying tort for negligent retention and supervision claims); *Akright v. Just Travel, Inc.*, No. 05-61133-CIV, 2006 WL 8431506, at *2 (S.D. Fla. Mar. 23, 2006) (same as to intentional infliction of emotional distress claim).

[7] The terms negligent supervision and negligent retention are essentially interchangeable.  *See Watts v. City of Hollywood, Florida*, 146 F. Supp. 3d 1254, 1262 n.4 (S.D. Fla. 2015) (citing *Grimm v. City of Boca Raton*, No. 15–80608–CIV–MARRA, 2015 WL 4483974, at *8 (S.D. Fla. July 22, 2015) (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005))).

allege that Ritz's tortious conduct was "outside the course and scope" of his employment.  Yule

disagrees.  She points to a ruling that admonished a defendant for making the same argument

advanced here.  In *Asia v. City of Miami Gardens*, the court rejected the defendant's argument that

the negligent supervision/retention claim was subject to dismissal because the plaintiff alleged that

the defendant's police officers "acted within the course and scope of their employment."  No. 14-

20117, 2016 WL 739656, at *6 n.2 (S.D. Fla. Feb. 25, 2016).  The court explained that "the 'course

of employment' element of the negligent supervision/retention claim refers to a particular period

of time, whereas the 'course of employment' element of a claim for vicarious liability refers to a

realm or sphere of conduct, not a timeframe." *Id.* (citing *Watts*, 146 F. Supp. 3d at 1262–63).

The Court finds Yule's reliance on *Asia* unavailing.  The ruling in *Asia* relied on an

explanation in *Watts* that in turn derived from a clarification in *Garcia v. Duffy*, a ruling by the

Florida Second District Court of Appeals.  In *Garcia*, the court ruled that "[t]he principal difference

between negligent hiring and negligent retention as bases for employer liability *is the time* at which

the employer is charged with knowledge of the employee's unfitness." *Garcia*, 492 So. 2d at 438

(emphasis added).  To be sure, in clarifying the difference between negligent *hiring* and negligent

*retention* claims, the *Garcia* court did not reformulate the elements of a claim for negligent

retention or supervision.  Rather, the court only clarified the meaning of the term "course of

employment"; it did not, however, alter the understanding of the term "scope of employment."

*See id.* at 439 ("Negligent retention, on the other hand, occurs when, during the *course of*

*employment*, the employer becomes aware or should have become aware of problems with an

employee that indicated his unfitness.") (emphasis added and citations omitted).

Beyond the paragraph clarifying the temporal differences between negligent *hiring* and

*retention* claims, the *Garcia* decision continued to recognize that the term "scope of employment"

refers to an employee's job duties.  *Garcia*, 492 So. 2d at 440 ("In general, the test is whether the employer exercised the level of care which, under all the circumstances, the reasonably prudent man would exercise in choosing or retaining an employee *for the particular duties to be performed*.") (emphasis added and citations omitted).

Since *Garcia*, Florida District Courts of Appeal have understood the term "scope of employment" as referring to an employee's job duties.  *See, e.g.*, *Acts Ret.-Life Communities Inc. v. Estate of Zimmer*, 206 So. 3d 112, 116–17 (Fla. 4th DCA 2016) ("Transporting Zimmer to whatever destination he wished was the very thing the ACTS drivers were hired to do. . . . Negligent supervision is simply not the appropriate claim to bring against an employer whose employees are acting within the scope of their duties."); *City of Boynton Beach v. Weiss*, 120 So. 3d 606, 610 (Fla. 4th DCA 2013) (addressing negligent retention/supervision claim against police premised on battery and excessive force while plaintiff was in custody, and noting that defendant was "absolutely correct that because a negligent supervision and retention claim involves the direct negligence of the [defendant], it requires that the actions of the employee be outside the course and scope of the employee's employment. . . .  Officer One acted within the course and scope of his employment at all times.  Because of this, the negligent retention/supervision claim must fail by operation of law."); *Watson v. City of Hialeah*, 552 So. 2d 1146, 1148 (Fla. 3d DCA 1989) (addressing negligent retention claim premised on an unlawful killing by police and noting that "[b]y its very nature, an action for negligent retention involves acts which are *not* within the course and scope of employment . . . .") (emphasis in original).

Courts in this District repeatedly dismiss negligent retention and supervision claims where a plaintiff fails to allege that the employee's tortious conduct was "outside the scope" of their job duties.  *See, e.g.*, *Whitaker v. Miami-Dade County*, 126 F. Supp. 3d 1313, 1329 (S.D. Fla. 2015)

(dismissing negligent retention claim with prejudice where plaintiffs alleged that "the officers were acting within the scope of their employment" when they used deadly force to end a high-speed chase because it was "undisputed that the acts giving rise to liability occurred within the officers' scope of employment"); *Belizaire*, 944 F. Supp. 2d at 1215 (dismissing negligent retention claim where plaintiff alleged that police used deadly force because "Florida law requires that a claim for negligent retention allege acts committed outside the course and scope of employment" and "the officers here were acting within the scope of their employment); *Frazier v. Israel*, No. 18-CV-61418, 2018 WL 4599622, at *4 (S.D. Fla. Sept. 25, 2018) ("In the Complaint, Plaintiff unequivocally alleges that deputies Hasson and Landells were acting in the course of their employment . . . thus, the claims for negligent hiring, supervision, and retention fail as a matter of law.") (citations omitted).  The same is true in other Districts.  *See, e.g.*, *Great Am. Assurance Co. v. Williamson*, No. 3:16-cv-372-J-32JBT, 2018 WL 6829786, at *5 (M.D. Fla. Dec. 27, 2018); *Thomas v. City of Jacksonville*, No. 3:13-CV-737-J-32MCR, 2017 WL 3316478, at *10 (M.D. Fla. Aug. 3, 2017), *aff'd*, 731 F. App'x 877 (11th Cir. 2018); *Santillana v. Florida State Court Sys.*, No. 6:09-cv-2095-Orl-19KRS, 2010 WL 271433, at *11 (M.D. Fla. Jan. 15, 2010).

It is clear, then, that to state a claim for negligent retention or negligent supervision, Yule must allege that Ritz's alleged conduct was "outside the scope" of his employment with the ORCA Entities.[8]  And here, Yule repeatedly alleges that Ritz's tortious conduct was "*within* the course

---

[8] Notably, Yule's Opposition appears to concede that her allegations are deficient on this point. Instead, she maintains that Florida law is not at all clear that "outside the scope of employment" is a necessary element of a negligent retention or negligent supervision claim. (D.E. 60 at 10 (citing *Paul v. Bradshaw*, No. 12-81381-CIV, 2013 WL 12084298, at *12–15 (S.D. Fla. Aug. 7, 2013) (citing *Green v. RJ Behar & Co., Inc.*, No. 09-62044-CIV, 2010 WL 1839262, at *4 (S.D. Fla. May 6, 2010)))).)  This argument is unconvincing.

and scope" of his employment.  (*See* D.E. 47 at ¶ 67 ("Defendant Ritz committed the tortious acts described in Counts IV through VI herein, within the course and scope of his agency and at all material times his conduct occurred within the time and space limits of his work as actually or apparently was authorized by the ORCA Entities."); *id.* at ¶ 75 ("At all relevant times, Defendant Ritz was the agent and employee of the ORCA Entities, and at all times material hereto was acting within the course and scope of his authority.").)  Therefore, consistent with the weight of authority, *see supra*, Yule fails to state claims for negligent retention and negligent supervision.  Thus, the motions to dismiss are **GRANTED** as to Counts 8 and 9, which are accordingly **DISMISSED**.

## D.    JURY DEMAND

The ORCA Entities also ask the Court to deny or strike Yule's demand for a jury trial because Yule signed an Employment Application that included a jury waiver provision. In response, Yule argues that the jury waiver provision in the Employment Application (the "Application") is superseded by the terms of the Employee Acknowledgement and Agreement (the "Employee Agreement"), which does not include a jury waiver provision.  She also argues that the Court should defer ruling on the Motion to Strike pending an evidentiary hearing or further factual development.  The Court disagrees that an evidentiary hearing is warranted, as Yule does not present evidence that calls into question whether the jury trial waiver was voluntary and knowing.  But in any event, this dispute can be resolved without an evidentiary hearing.

Federal Rule of Civil Procedure 38 preserves the right of a jury trial as declared by the

---

First off, the argument runs against a bulk of authority to the contrary.  And second, as this Court previously explained, the ruling in *Green*—which the *Paul* court relied on to discount the "outside the scope of employment" element—found that the plaintiff adequately stated a claim *because* she alleged that the defendant's employee acted outside the scope of his employment, thus "obviat[ing] any need to ascertain the precise contours of Florida law."  *See Belizaire*, 944 F. Supp. 2d at 1215 (citing *Green*, 2010 WL 1839262, at *4).

Seventh Amendment to the Constitution. *Mega Life & Health Ins. Co. v. Pieniozek*, 585 F.3d 1399, 1403–04 (11th Cir. 2009). A party may validly waive its Seventh Amendment right to a jury trial "so long as the waiver is knowing and voluntary." *Bakrac, Inc. v. Villager Franchise Sys., Inc.*, 164 F. App'x 820, 823 (11th Cir. 2006) (citing *Brookhart v. Janis*, 384 U.S. 1, 4–5 (1966)). But the right to a jury trial "is fundamental"; so this Court must "indulge[] every reasonable presumption against waiver." *Mega Life & Health Ins. Co.*, 585 F.3d at 1403 (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1544 (11th Cir. 1993)); *see also Borgh v. Gentry*, 953 F.2d 1309, 1311 (11th Cir. 1992) (noting court's discretion "is very narrowly limited and must, wherever possible, be exercised to preserve jury trial") (citation omitted).

Although the Eleventh Circuit has yet to decide who must carry the burden of proving whether a contractual wavier of a jury trial was knowing and voluntary, "the greater weight of the decisions places the burden on the party seeking to enforce the waiver." *Bakrac, Inc. v. Villager Franchise Sys., Inc.*, No. 02-23434-CIV, 2003 WL 25730511, at *1 (S.D. Fla. Nov. 3, 2003) (collecting cases); *see also Strickland v. Wyndham Vacation Resorts, Inc.*, No. 6:13-cv-1000-Orl-28GJK, 2014 WL 12873407, at *3 (M.D. Fla. June 10, 2014) (placing burden on party seeking to enforce the waiver) (citing *GE Commercial Fin. Bus. Prop. Corp. v. Heard*, 621 F. Supp. 2d 1305, 1311 (M.D. Ga. 2009) (noting majority of courts place burden on party seeking benefit of waiver)).

Here, the Application, which Yule signed on September 15, 2016, provides *inter alia* that by signing the Application, she waived her right to a jury trial over any claim related to her separation from employment: "By signing this application, I waive my right to a jury trial over and any claim or controversy related to or arising under this employment application and, if I am hired, my employment (and any of its terms and conditions) *and/or my separation from employment* . . . ." (D.E. 49-1 at 5 (emphasis added and capitalized text removed).)

- 22 -

Four days later, however, Yule signed the Employee Agreement, which unequivocally provides that it "is the *entire agreement* between ORCA and [Yule] *regarding* the length of [her] employment and *the reasons for termination of employment*, and *this agreement supersedes any and all prior agreements regarding these issues*."  (D.E. 83-1 at 2 (emphases added).)

The ORCA Entities argue that neither the length of employment nor reasons for termination are implicated, discussed, or addressed in the waiver provision in the Application.  But the terms of the Application's jury trial waiver provision specifically apply to any claims arising from or related to Yule's "separation from employment."   (D.E. 49-1 at 5.)   And the Employee Agreement—signed by Yule *after* the Application—"supersedes any and all prior agreements" regarding "reasons for termination of employment."  (D.E. 83-1 at 2.)

Based on the plain meaning of the Application and the Employee Agreement, it is clear to the Court that the Employee Agreement supersedes the Application's jury trial waiver provision as that provision relates to claims concerning termination of employment.  And here, the claims against the ORCA Entities specifically challenge the legality of Yule's termination of employment: "Her resignation was the direct and proximate result of a hostile work environment that the ORCA Entities and Defendant Ritz had perpetrated, and which continued unabated. (D.E. 47 at ¶ 35.)

In addition, the Application states that it "will be considered 'active' for a maximum of thirty (30) days" and that "if you wish to be considered for employment after that time, you must reapply."  (D.E. 49-1 at 5 (capitalized text removed).)  So, to the extent the Application "is an agreement that is 'considered 'active'' for in excess of 30 days—contrary to what it states—and constitutes a waiver of Plaintiff's right to a jury trial over any claims related to her separation from employment with ORCA, it is an agreement at odds with the Employ[ee] Agreement's statement

it 'is the entire agreement between ORCA and [Plaintiff] regarding the length of [] employment and the reasons for termination[.]" *See Marquardt v. Ocean Reef Cmty. Assoc.*, No. 19-cv-10110, D.E. 77 at 4 (S.D. Fla. Feb. 3, 2020) (ruling plaintiff employed by Ocean Reef Community Association did not waive right to jury trial).

The Employee Agreement also provides that "[i]t is further agreed and understood that any agreement contrary to the foregoing must be entered into, in writing, by the President or Chairman of ORCA." (D.E. 83-1 at 2.) Holding aside the fact that the Employee Agreement was signed *after* the Application, under the Employee Agreement's terms, the jury trial waiver provision in the Application cannot supersede the Employee Agreement because neither the President nor the Chairman of ORCA signed the Application. (*See* D.E. 49-1 at 2; *see also Marquardt*, No. 19-cv-10110, D.E. 77 at 4 ("[T]he Application was not signed by the ORCA President or Chairman, a requirement ORCA insisted on in any 'agreement contrary to' the Employ[ee] Agreement.").) And the ORCA Entities do not present any agreement that Yule and the President or the Chairman of Ocean Reef Community Association entered into after the Employee Agreement that changes the Employee Agreement's terms.

Furthermore, although the terms of the Application and the Employee Agreement are clear, to the extent they are ambiguous, such ambiguity must be construed against the drafter. *See Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (citing *Hurt v. Leatherby Ins. Co.*, 380 So. 2d 432, 434 (Fla. 1980)). This is particularly true where the drafter seeks to enforce a jury trial waiver provision. *See Azure, LLC v. Figueras Seating U.S.A., Inc.*, No. 12-CV-23670-UU, 2014 WL 11531792, at *3 (S.D. Fla. Apr. 22, 2014) (finding no voluntary and knowing waiver of right to jury trial where "the scope of the waiver provision [was] glaringly ambiguous"). And finally, even if the issue was close, the Court is required to "indulge[] every reasonable presumption

against waiver." *Mega Life & Health Ins. Co.*, 585 F.3d at 1403 (quoting *LaMarca*, 995 F.2d at 1544). Nevertheless, because it is clear that Yule did not waive her right to a jury trial, the motion to deny or strike Yule's demand for a jury trial is **DENIED**.

## CONCLUSION

The Court emphasizes that at this stage, Yule's allegations are the ones given weight. Ritz will surely have his opportunity to present evidence at summary judgment in support of his defenses. The same goes for the ORCA Entities. For now, though, the Court must take Yule's allegations as true. And for all the reasons explained above, it is

**ADJUDGED** as follows:

**(1)** Ocean Reef Community Association's Motion to Dismiss **(D.E. 48)** is **DENIED** as to Count 7, and **GRANTED** as to Counts 8–9;

**(2)** Ocean Reef Community Association's Motion to Deny and/or Strike Plaintiff's Demand for Jury Trial **(D.E. 49)** is **DENIED**;

**(3)** Defendant Ritz's Motion to Dismiss **(D.E. 50)** is **DENIED** as to Counts 4–6;

**(4)** Defendant ORCAT, Inc.'s Motion to Dismiss **(D.E. 51)** is **DENIED** as to Count 7, and **GRANTED** as to Counts 1–3 and 8–9;

**(5)** No later than **Friday, June 26, 2020**: Ocean Reef Community Association must answer Counts 1–3, and 7; ORCAT, Inc. must answer Count 7; and Ritz must answer Counts 4–6; and

**(6)** The stay of discovery **(D.E. 105)** is **LIFTED** so that discovery can resume.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 8th of June 2020.

*Federico A. Moreno*

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record